Good morning, your honors, counsel. May it please the court, the matter that has been briefed before you today Excuse me, counsel, your name? Oh, I'm sorry. Kevin McQuillan, M-C-Q-U-I-L-L-A-N, on behalf of the plaintiff, appellant. This is a matter that involves the administration of an anticoagulation therapy utilizing injections of a drug called Lovenox, a blood thinner. It's a treatment regime. Up until the time of trial, all the medical personnel, everyone agreed this was a treatment regime. What we believe we will show by the briefs and also today is that while we've raised a number of issues, I'd like to focus on three areas. One of those areas is the lack of consent medical battery area, where the judge directed a verdict at the end of the plaintiff's case. The next area was the trial judge directing a verdict for Dr. Maurice, who was the primarily responsible physician, essentially on the basis that although she was a licensed physician, she was a resident, and as he put it, the low person on the totem pole. The third point, which is sort of an overall point, is that the cumulative effect of the trial court's rulings in this matter deprived the plaintiff of a fair trial. We believe that on any one of these points, and there's some sub-points on the fair trial part, that if any of these points had gone differently, the matter very well may have resulted in a verdict for the plaintiff, and taken as a whole, it shows the plaintiff did not have a fair trial. We're not here today to make new law. We believe the law is very clear on lack of consent medical battery. What we're asking for is to have a trial in conformance with that law, and we're also asking to have a fair trial by a jury that's allowed to weigh all the relevant evidence. The standard we went by in the plaintiff in trying their case on the medical battery is based on the cases we've cited in Mink v. University of Chicago, Gaskin, and McNeil. One of the points I'm making is that if the plaintiff was allowed to try their medical battery case, it's simple, it's straightforward. Did Zarco-Sicaris consent to the administration of the Lovenox regime? Second question, did he refuse that treatment, and was that documented yet not honored by the doctors? We believe that the judge's taking of the battery case away from the jury was not supported by any of the evidence, and in fact, there was sufficient evidence that Zarco did not consent to the shots, and furthermore, he refused them. One of the points is that on directing the verdict, there was more than slight evidence for denial of that directed verdict. Furthermore, consent issues are for the jury, not for a judge. The scope of the plaintiff's consent is crucial to his ultimate recovery in a battery action. The time, place, and circumstances will affect the nature of the consent given. These questions, however, are questions of fact which are to be determined by the jury, not by the court on a motion to dismiss or a directed verdict, and I'm quoting directly from the main case. The trial judge incorrectly had stated that, well, there has to be an intentional infliction of battery. The doctor has to do it, things of this nature. Mink and its progeny, which are based on Prosser's Law of Tort, Section 9 at 36, is the gist of an action for a medical battery is not the hostile intent of the defendant, but rather the absence of consent to the contact on part of the plaintiff. Gaskin, the court in Gaskin, made it very clear that under Illinois law, claims alleging a total lack of consent to medical procedures are treated as batteries because they involve an intentional, unauthorized touching of the person of another. Recovery under a battery theory is allowed where the treatment is either against the patient's will or substantially of variance with that consent. What you boil it down to is a defendant is liable for battery if they have done some affirmative act intended to cause an unpermitted conduct. It is enough that the defendant sets a force in motion which ultimately produces the result. In Mink, the case that all of our, while it's a federal case, all the cases in Illinois on medical battery fall from that case. What the situation is, doctors ordered that nurses give oral medication to patients. That was determined to be a battery. In this case, we have doctors ordering a nurse to give an injection to a patient. There's no question there was no consent. No written consent in the file, no oral consents in the record at all. Plus, it's documented in the record on one page. It specifically, the nurse says when they go in to give him the first Lobanac shot, patient says, I don't need blood thinners. She puts in there, patient has refused treatment. Dr. Maurice, who was dismissed out, notified. That is documented in the chart. Yet you go about an inch below that, the attending physician comes in a day later and says, continue the Lobanacs. Your Honor. Counsel, you have about one minute left in the no question free zone. Okay. Thank you. The next point on Dr. Maurice is that we believe that once she was the primarily responsible physician. This is a doctor who had entered almost 600 orders for this patient over an eight-day period, who saw him when he initially came in. She ordered the administration of the Lobanacs. She was told he didn't want it, that he'd refuse. She didn't enter an order to discontinue it. She came back in after some time off and agreed with the other physicians to continue it. She's a licensed physician. The third point, and there are a number of points on this, basically what happened is the plaintiff was constricted in what they could prove. We were limited to a 72-hour period. What happened when he came into the hospital, got the Lobanacs, and what happened was once they got a CAT scan, they waited 72 hours before they would lighten the CAT scan and said, well, there is no pulmonary embolus. We don't need blood thinners. They decreased it and discontinued it. We were not allowed to show that change because the trial judge said that we were not allowed to go into his previous hospitalization three weeks before for the same issues to show how it was dealt with then. You suspect a PE, you chart it, you get a spiral CT scan. That rules it out. You discontinue the Lobanacs. End of story. Comes into this hospitalization, comes in, they claim after the fact, the first time there's any mention of a PE, a pulmonary embolus, is in the discharge summary done weeks after he's dead. They get a CAT scan. They don't leave it for 72 hours. They get it, they decrease the dose, but by then he's already had massive bleeding on the brain. We were not allowed, the defendants were allowed to go back to 1999 and say how sick this man was, look at all his prior care. We were not allowed to put in our case or to cross-examine the same doctors they called as experts who were involved in the prior hospitalization and say, isn't this how you did it three weeks before? Nor were we allowed to show that they decreased the dose and then stopped it based on a CAT scan. The judge said, well, you haven't said there's anything, those weren't deviations from the standard of care. I said, you're exactly right. Those are the standard of care. Same physician, same hospital. We were not allowed to show that. Thank you, counsel. All right. Questions? I do have a question. You've not mentioned anything about the, what is it, the CRCL? Oh, his CLL? Right. His leukemia? Right. No, the test. The preemptive test. Oh, okay. The CRCL. Preemptive clearance. Okay. What happened in this situation was, and we were not allowed to go into this, the prior hospitalization that was documented, they had fluid overloaded them. When that happens, it starts to affect your kidney function. On this hospitalization, could you tell us what happened in this hospitalization? This hospitalization, they did not monitor properly. They had a dosing code procedure. They were supposed to, if there were certain kidney functions at a certain level, they had to do a calculation to determine, were his kidneys clearing out the lobe locks or not, or was it building up in his system? None of that is documented in the chart whatsoever. We don't know whether they did it or they didn't do it, but we know that it's not in the chart. It's not in the chart. It was in the charts once, is that correct? It was never in the charts. Never in the charts. Now, and that was one of the issues at the time of trial, was that platelets experts said if you do the calculations now, it shows that that dropped below the 30 number where they said you shouldn't be given a Morbidox. One of their experts admitted that on cross, that when he did the math that came out of his notes produced at the trial, it came out to 30, which meant it should have been stopped. It was not stopped. One of the problems we had is they then allowed one of their doctors, Dr. Schlieven, who was a second-year resident who's now a nephrologist who was never disclosed as an expert, to come in and testify as a different way to calculate the creatinine clearance based not on actual body weight but ideal body weight. I objected under 213. The judge allowed it in. They had a free expert saying this is how you calculate the creatinine clearance. I objected under 213. I did a motion to strike. I did a motion for a mistrial. I did a motion to be able to call rebuttal to bring a nephrologist in to say this is not the correct way to do it. So that was one of the significant points in this where they allowed this second-year resident who was not a nephrologist at the time who is now to testify as a nephrologist, and then basically the last thing the jury heard is that here's how you calculate it. He in fact said, well, it's ideal body weight. He said Refrigerator Perry and I would have the same creatinine clearance. It's totally incorrect. We were not allowed to bring in another expert to rebut that. The first time anybody heard that was in the courtroom, it was objected to under 213. In the autopsy, it's clear that there was intracranial hemorrhaging. Is that correct? Absolutely. There were three or four bleeds in the brain. Our point is, and one of the things we wanted to show from the prior hospitalization just three weeks before, they'd done a CAT scan that showed his brain was free from the CLL, from any leukemia, any infiltrates. We were not allowed to show that. We have a man who walks into the hospital on June 20th, is given Lovenox at not just a prophylactic dose, but a treatment regime, very aggressive regime, and four days later he's got four bleeds on the brain that shove his brain down through the base of his skull. The only thing different this treatment, this hospitalization from the other ones, was they put him on this treatment dose. We were not allowed to go into that prior CAT scan to show, and this is by the same hospital, the same doctors, the same people, saying, oh, we looked at his brain, there's nothing wrong with his brain because of leukemia. Yet they then brought experts to say he died because the leukemia had nothing to do with the Lovenox. The other point, if I could come back to on Dr. Maurice, I think that once the court directed Maurice out, it was basically directing out all the defendants because she was the one that did all the work, did all the ordering, saw the patient, both before and after. In fact, she was the one that ordered the decrease in the Lovenox. She was on for a day and a half or two days. That's correct. But she was the one that she prescribed the Lovenox. She started it out. She was the one that also ordered the CAT scan that someone read while she was gone and said there's no pulmonary embolus, yet she came back, she claimed, sorry. I'm sorry. Your expert agreed that the initial order for the Lovenox was okay. Yes. What you do, it's okay to put him on a prophylactic dose. You get a CAT scan. If the CAT scan says there's no pulmonary embolus, you stop it. Our experts said that, but I was not allowed to present that, nor was I allowed to cross-examine their experts. They used some of the doctors from the prior hospitalizations as their experts. I should have been able to cross-examine them and said, isn't it correct that this is the proper procedure? You suspect PE. You put him on a prophylactic dose. You get a CAT scan. If there's nothing there, you stop it. I was not allowed to go into that. They raised a point. They said, well, you didn't preserve that or whatever. That whole prior record was not just an offer of proof. It was admitted into evidence. I had that as evidence in the record. It was admitted as an exhibit, but we're not allowed to discuss it. Could you tell me Russia's consent form, how does that relate to medication as opposed to what the defense is calling treatment? It relates to everything. The thing is the defense, up to the point of the trial and even during the trial, acknowledges that this Lovenox regime is a treatment. If you look at that consent form, the consent form applies to everything. There is no exception in there for medication. In fact, if you look at it, it's sort of divided into a hierarchy. What are the less important items? What are the more serious? What are the most serious ones? When they list the items that aren't that important, they talk about physical exams, drawing blood, taking x-rays. They don't put in there medications you don't need a consent for. Even for those things, even if you do a physical of someone or draw their blood, you still have to get an oral consent and document it in the chart. We have here a medication that their doctors have acknowledged has a significant risk of brain bleeds, and yet there's nothing in the chart. And they took the position, and one of the things I objected to, they had never disclosed this before, that, oh, this doesn't apply to medication. They answered an interrogatory request to admit, saying, this is the procedure that applied to the medication here. And the patient here had refused the Luvonex twice, as I understand it. One time. What happened is they came in to give him the first shot, and it's not clear from the record, but within an hour of when they said they gave him the first shot, the nurses recorded his refusal of the treatment. In fact, they don't give it to him that afternoon. But what happens is Dr. Maurice goes for her day or two off. She admits she does not do the transition to the next doctor to say, oh, by the way, this guy has refused it, which they normally have a form they do this transition. It's clearly in the record. The doctor that came in and started him on it again, but now upped it to from 40 twice a day to 70 twice a day, said, oh, everything was there, but I didn't know he'd refused it. And he was alert at the time, according to the chart? Oh, absolutely. In fact, the doctor, I put several of their doctors on as adverse witnesses. The doctor that upped it at about 6 o'clock in the morning said, yes, I was talking to him. He was alert. He was oriented. And I said, well, did you discuss the Luvonex with him? No, I did not. So it's not like the man had a significant medical problem or was asleep or somebody couldn't answer for him. We have a very intelligent man here. This guy's a civil engineer. He's a surveyor. He had been through this three weeks before, and he said, I don't want it. I don't need this. Is there anything in the Rush protocol that says that once somebody refuses something, they have to refuse it every single time? No, what happens, in fact, is just the opposite. Once they refuse it, the protocol is very clear that once there's a refusal, you have to start from ground zero again with all the consent and everything else of that nature. Was it an unequivocal refusal or did he just simply say, I don't need it, expressing an opinion as to whether or not that happened? If you look at the chart and read it in context, the nurse clearly understood it because her note is in there, advise Dr. Maurice that patient has refused treatment. So the nurse clearly understood the effect of what this – we know they can't write down everything, but it's clear on that. And I attached that as part of one of the supplemental records. That particular page, if you look at it, the nurse – she's got it in quotes. The patient says, I don't need blood thinners. The reason he said he didn't need them is – but she obviously understood. Here's the thing. They said, oh, this is medication. It's not a treatment. Their own nurse writes in the record, patient has refused treatment. She doesn't write patient has refused medication or shot. They clearly understand that that is a treatment. And there is nothing in the record that anybody accepted it on his behalf. That's correct. No acceptance. There's not even an oral consent in there where the doctor says, I discussed this with the patient. He consented. Absolutely nothing. Thank you. Thanks. Good morning. Mary Ellen Bush for the Epilees, all the doctors and Rush. The entry of a directed verdict in favor of the doctors and the hospital with regard to the battery count was absolutely appropriate. The plaintiff failed to establish a prima facie case for medical battery. Specifically, there was absolutely no evidence presented by the plaintiff to show that on those doses that Mr. Sequeres refused the Lovinox that it was given. When he was admitted, he was appropriately, even according to their experts, placed on a prophylactic dose of Lovinox. This is to prevent a PE. It's not because they suspected he had one. It is to prevent one given his underlying medical condition, his age, and the fact that he was bedridden. He had an oxygen saturation of 80%. That is extremely low. His oxygen needs were increasing dramatically. He had respiratory issues going on, and he had underlying CLL, which is a malignancy of the blood. These were all indications that he should be on a prophylactic dose, and nobody criticizes that. He gets the 30 milligram dose, first dose in the morning. He tells the nurse, I don't need blood thinners, and the blood thinners are not given in the afternoon. At 4.30 the following morning, he has an acute respiratory situation where his oxygen saturations drop, his blood pressure bottoms out, and Dr. Wendt, the other first-year intern, whose job is to transcribe orders given to her by the senior people there. She is not making any independent decisions, nor was Dr. Maurice making any independent decisions. Dr. Wendt increased the dose to what is called a therapeutic dose at 70 milligrams twice a day. As Mr. McClellan pointed out, the patient was alert and oriented. He knew how to refuse medications. He had done that before, and it had not been given to him at the time. He obviously accepted this dose. It was given to him when he was in this situation on the morning of the 22nd. It was the afternoon dose, or evening dose I should say, on the evening of the 22nd was given, and on the morning of the 23rd it was given. He then refused it again, and it was no longer given. The situation that put him in extremis on the 24th occurred more than 24 hours after the last dose of Lovonax was given, and there's absolutely no, all the witnesses agreed that the Lovonax would have been cleared out of his system by that time. The plaintiff has failed to prove that Mr. Sequeres ever got any treatment that he refused at the time it was being given. It is obvious that he knew how to refuse it, and when he did, it was documented on the medical record that he had refused it. The consent form that Mr. McClellan talks about is not applicable to medications. It would be terribly unwieldy. If you think about the, I think this man must have been on something like 30 medications, if you needed a written consent to give somebody an aspirin in the hospital, it is just not the way it's done. What is done is if the patient refuses, it is documented that they refused, and in this case they did document he refused, and it was not given when that dose was refused. You do not have to go back and document an acceptance when it's obvious that he accepted it by taking the medication that was offered. The plaintiff's expert agreed that he did not give the Lovonax on those occasions when he had refused it. There is no testimony, and I think it's just the opposite. Every one of the doctors agreed that the consent policy is not applicable to medications, despite the fact that every medication from an aspirin to Lovonax is considered treatment. It's obviously a treatment, but it is not an invasive treatment. It is not an invasive procedure. Now, the policy doesn't make that distinction, but if you look, but in the medical records, it is clear that all of the written consents that are in there were for invasive procedures such as a bronchoscopy, the insertion of certain lines, that type of thing. There is absolutely no written consent in there for any of the numerous medications he was on because it's not applicable. Mr. McClellan argues that the doctors should not have been allowed to testify that the policy was not applicable, but he never made that objection at trial. He never made the objection when he amended his complaint on the eve of trial, asking to add the medical battery count. Based on the policy, Judge Siriano said, you can amend your complaint and add that count, but I'm going to let them talk about this policy and explain what it's about. He didn't object at the time. He didn't object when Dr. Maurice or any of the other doctors testified that that policy was inapplicable to medications, and he had no evidence contrary to that. The policy alone is not sufficient to raise the question of fast care to present to the jury. He needed to establish that the policy was the standard of care or that the policy itself applied to this situation and that the policy was violated and that the violation of the policy caused the injury. This policy deals with documentation. It doesn't deal with the actual procedure. It deals with documentation. So it does not have any effect on the outcome. Even if the testimony by the physicians regarding inapplicability of the policy was excluded, the plaintiff cannot rely on the documentation of consent to show whether or not the battery occurred because he doesn't have any testimony to say that the plaintiff did not, the decedent did not consent at the time that the medication was given. And that's his burden. Mr. Szekeres presented to the hospital for treatment. This is significantly different than the mink case. In the mink case, these women were used as guinea pigs in an experimental procedure they were totally unaware of. Pregnant women were given DES, which is a drug that apparently is used to prevent miscarriage, that caused birth defects. These women didn't even know they were on this drug or that they were a member of this experimental group. There was a total lack of consent here in that case. In this case, Mr. Szekeres presented to the hospital for treatment. He did not walk into the hospital a healthy man. He walked into the hospital with a deteriorating condition, cancer and mastocytosis, in addition to pneumonia and decreased respiratory status. He gave consent, implied at least, to all the medications he was taking simply by taking them. As Mr. McClellan said, he's an intelligent man. He could easily have refused. And at the time he did refuse, it was not given. And there's been no testimony that it was given at moments when he refused. The policy regarding the documentation of consent was inapplicable to medications, and there's no indication that Mr. Szekeres ever received any treatment that he had refused. The directed verdict on behalf of Dr. Morris is absolutely appropriate. Dr. Marty, their only expert, testified that Dr. Morris, by transcribing or writing the order for the 30 milligrams of Lovonox upon admission, was appropriate. That was an appropriate order. It wasn't her order. She wrote it down, but it was given to her by the seniors. But nonetheless, it was an appropriate order. He never criticized Dr. Morris for anything. There is not one criticism of her by Dr. Marty in his testimony. Mr. McClellan would have you believe that she is guilty simply by the fact that when she returned to work on the morning of the 22nd, she acquiesced in, or is it the 23rd? 23rd, sorry. When she returned to work on the morning of the 23rd, her acquiescence in the order entered by Dr. Wendt 24 hours before somehow should have kept her in this case. But there was no showing that she was aware of that order. The Lovonox was only given one more time. She came in about 6 in the morning. The Lovonox was given for the last time at 9 that morning. There's no testimony that even if she had disagreed with that order as a first-year intern, if she had brought that disagreement to the notice of Dr. Schlieving or Dr. Silva, that anything would have been done differently. The attending and the senior residents both agreed that this medication was appropriate, the 70-milligram dose. And I think the proof is in the pudding also in the fact that Dr. Silva, the jury found in favor of Dr. Silva and Dr. Schlieving and Dr. Wendt. And the only thing Dr. Wendt did was write that order for the 70 milligrams. So there's no reason to believe that they would have found against Dr. Moritz for that. And Dr. Marty, frankly, did not criticize that order. In fact, he specifically said he did not have any criticism. He thought it was appropriate for them to increase the dose of Lovonox when his respiratory status changed at 4 o'clock in the morning on the 22nd because there is a concern that it might have been a PE. Turned out it wasn't. But that doesn't mean you don't treat it if you believe that there's a possibility it could be. The jury had no basis to find that Dr. Moritz deviated from the standard of care or that anything that she did caused or contributed to Mr. Sakharov's death. Actually, we've got about one more minute in the question. Sure. The plaintiff then presents a bunch of different evidentiary arguments which I don't think amount to any reversible error or any error at all for that matter. He argues that he should have been allowed to present evidence that the administration of Lovonox during a prior hospitalization should have been allowed in order to establish what the true standard of care is for the administration of Lovonox. But he never made an offer of proof as to what that testimony would be or what anybody would say with regards to what the administration of Lovonox would be in a situation such as the one Mr. Sakharov presented with during this admission. His condition was very different than it had been a couple of weeks before. But the bottom line is there was no offer of proof that anything about the Lovonox administration during the prior admission would have had any relevance at all to the use and administration of Lovonox during this admission. And furthermore, anything that a doctor does on a prior occasion, a doctor's personal practice is not relevant to establish the standard of care. And that's all he was trying to do was to say, see, this is what they did the last time he was in. That's the standard of care. This isn't the standard of care. But we don't even know what that conduct was because he never made an offer of proof about it. He also argues that the testimony that the CT scan done on June 21st when he was admitted, I just heard him say that that CT scan was being done because they thought he had a PE. No, that is not why the CT scan was done. The CT scan of the chest was done when he was admitted to the hospital because he had an oxygen saturation of 80%, and they wanted to see what was going on in his lungs. As it turned out, he had pneumonia, atelectasis. He had CLL in his lungs. He did not have a PE. Nobody said that it took 72 hours for them to read that. That's not true. And when he decompensated 10 hours later, basically that CT scan is irrelevant in showing whether or not he had a PE or whether it was reasonable to believe that his decompensation was caused by a PE 10 hours later. And I think that in the transcript, Mr. Austin actually used a great example. He said, if you take a picture of an automobile now, and it's in pristine condition, and 10 hours later it's been side-squashed by a Mack truck, it's going to look very different. This picture is irrelevant to show what was going on 10 hours later. Same here. In this case, the doctors testified that they could not rely on the CT scan done on the 21st to show that there was no PE on the 22nd. So it was appropriate to be concerned that that's what was going on, given his decompensation. And further, all the doctors, Dr. Wentz, Dr. Schlieving, Dr. Silva, and Dr. Fintel, all testified that you can't rely on the CT of the 21st to determine if there was a PE on the 22nd. Was there a CT performed on the 22nd? No, there was not. Why not? Because he was not stable enough. At the time that he went into respiratory distress, he was not stable enough. When he received the Lovenox and his respiratory condition stabilized, they decreased the Lovenox. In fact, he stopped taking it. So they did not take him back down to do a PE because there really wasn't any need to. He was being treated as if it were present, which their doctor, Dr. Marty, agreed was appropriate. You cite to Dr. Marty on a number of occasions. Did he give an opinion regarding the cause of death? The only thing that he said was a general question in response to an inquiry by Mr. McFarland, do you have an opinion as to whether or not the Lovenox caused Mr. Sekere's brain bleed and his death? And he said, yes, my opinion is it did. Can we just talk about the consent issue for a moment? Sure, absolutely. Is it your position that an alert patient, every single time a nurse or someone approaches with a bunch of medicine, has to say again and again and again, I don't want that? Yes. Well, it depends. The thing is, what you don't want to do is put a patient in a situation of saying, because he doesn't want it on one occasion doesn't mean he can't change his mind later. Well, do you have to document that he has changed his mind? No. That he's agreeing to it? I don't think you have to document that he agreed to it. I think you have to document that he did not. And that's what the practice was. Is there any documentation that he was asked, oh, sir, I know you said you didn't want the Lovenox before, but I have it in my hand now, do you want it this time? No. The next time that he took it after he gave that refusal, well, first of all, that is not something that would be documented. But after he gave that refusal on the 22nd, on the 21st, he did not get it again. He got the one dose. No, he got it again at 10 a.m., 70 milligrams, not 30 milligrams, on the 22nd, and again at 9 p.m., 70 milligrams on the 22nd. Right. And then on the 23rd at 9 a.m., 70 milligrams. And then he refused it again. Right. According to my understanding, Mr. McClellan, I'm sorry, I will stand corrected. If you can show me, I'm wrong. And then he was in a coma. So he couldn't have refused it or accepted it. When his condition deteriorated dramatically at 4.30 in the morning on the 22nd, that's when the dosage of Robinox was increased. And that's the first dose he got was around 10 in the morning. But that is why it was increased. And there aren't any criticisms of that. My question is, did somebody say, you know what, your condition is getting worse, yesterday you said you didn't need it, and we didn't give it to you the second time, but how about today? Did you ask again? Well, Dr. Wendt, when she was asked this question, contrary to what Mr. McClellan just said, she could not recall the conversation she had with the patient that morning. And it's not documented. No, and it wouldn't be. And it wouldn't be. No. So patient refused, there's nothing that anybody could look to later that says, oh, patient changed his mind, okay now. Other than the fact that it was given. But we don't know if it was given without his consent. In a state of confusion or? Well, he was not. As Mr. McClellan pointed out, he was alert and oriented even at 4.30 that morning. As a civil engineer, he had refused it before and had not gotten it. It is apparent that he accepted it because of the fact that he did not refuse it. It is documented when it is refused. It does not have to be documented every single time. If the nurse had to spend that time, and he was on a list of medications like this, going through saying patient accepted the Lominar, patient accepted the aspirin, patient accepted. I'm not asking about the stuff that he never refused. I'm just asking about the one thing that he did specifically refuse. And I'm just curious about why somebody wouldn't take the time to say, did you change your mind about this, sir? I have it in my hand. How about it? And give him a chance to either accept it or honor his refusal. In actuality, he refused numerous medications at numerous times throughout the hospitalization. And treatments. And treatments. Yes. And those things were documented. If he accepted the medication the next time it was offered, it is not documented. Patient now accepts. It is just documented that he took it. What evidence would there be that he acquiesced in that or that he rescinded his refusal? Well, I think that the evidence, the plaintiff has the burden of showing that at the time he was given the medication, he had refused it. And that is not, there is no evidence of that. The times that are documented, there are several medications, as I said, several times that the Lominar is documented that he refused it. That dose was not given. And I don't think you have to document specifically, well, even if it was a documentation issue, it doesn't really have to go to whether or not the treatment was rendered. Whether the treatment was rendered against his consent, I think it is implied that the treatment was rendered. There is no testimony anywhere or that the standard of care requires or that the policy requires that documentation of the patient's acceptance of medication be documented. Were any of the medications that he did receive pain medications? I honestly don't know. Were any of them pain medications? I have the chart in front of me. I don't recognize his name, so I don't know. Do you have a copy of the consent policy? I do not, Judge. The consent policy, I'm sorry. Without it being present, I'm reluctant to rely on the briefs. However, you're suggesting that before or after the decedent indicated he did not need the blood thinner, that the policy would be text. Would be what? Put through needless paperwork if hospital personnel were to document each time there was medication rendered or given to a particular patient. Well, I think first of all, I think the testimony was, and it's unrefuted, that the policy does not apply to consents for medication. Every doctor testified that the policy does not apply to medications. That being said, yes, it's not that the policy would be text or that they would be put to more paperwork. They do document when the medication is given. Let me read what I have. Purpose of consent. Hospital personnel have a legal duty to refrain from treating the patient unless the treatment has been authorized by the patient. Similarly, the patient has a right to refuse to authorize treatment. A consent is obtained from a patient for treatment in order to protect the physician, the nurse, and the hospital against claims of unauthorized treatment. Any treatment or procedure which poses a risk to the patient should be authorized in writing after the risks and complications have been explained to the patient. A consent given to a patient after such an explanation is commonly referred to as informed consent. Where in what I've just read suggests that the decedent in this instance subsequently withdrew, or as you apply what I've just read to the consequences leading up to the decedent's passing, would suggest that he at any point revoked his denial of treatment. He indicated quite clearly, I don't need a blood thinner. And I hear you arguing that he weighed that by receiving treatment and going forward for the next three or four days that he remained in the hospital. His consent was not necessary. No, I don't think I said his consent was not necessary. I think it's implied that he gave his consent. His situation, first of all, as you've read it, Your Honor, it deals with informed consent. And this was argued back and forth at the beginning of the trial that this was supposedly not an informed consent case. This was supposed to be a medical battery case. And as Judge Suriano pointed out, this man admitted himself to the hospital for treatment. That is accepted. It's not like he wanted to walk away. Now, with regard to the specifics of this, when his condition changed, and quite dramatically the next morning, and his respiratory status and blood pressure dropped, and then he accepted the Robinex for the next three doses, but only the next three doses, I think it is fair to assume that he understood his condition and decided to go along with that treatment because he certainly knew how to refuse it if he didn't want it. And he was a smart man, and he did pick and choose the types of treatment he wanted to receive throughout his hospitalization. So I think that there is an implication, and certainly I think it's quite a strong implication, that on those occasions when he took the medications he was offered, he was accepting them, and on those occasions when he refused the medications he was offered, he did not get them. And that's where the unauthorized touching comes in. It's not, he could have refused all medications from that point forward. He didn't. He chose certain ones at certain times and refused them at other times. I don't think that, and there is no written consent applicable to medications. That policy is not applicable. Despite what the plans attorney would have you believe, all of the testimony from the doctors specifically said it doesn't apply to medications. If the patient refuses it, yes, the nurse documents that they refused it. And he needs to renew his refusal before he receives any further attention. Which he, in fact, did that afternoon. He refused it, he took the first dose. Then he said, I don't need blood, the nurse. That night he must have refused the second dose because he did not get it. Then he accepted it for three doses and then he refused it again. Could it also be that he wasn't administered the second dose because the doctors or the nurses responded or acknowledged his refusal, his earlier refusal? You mean that wasn't offered to him at that time? I don't know. I don't know. It's clear that he did not get the evening dose. And you argue because I think I just heard you say because he apparently told him again. But there is another alternative, and that is that staff honored his original statement, I don't need blood, the nurse. That's true. I suppose that could be interpreted in that way. I think the bottom line here, too, is that the doctors were not there giving the medication. They wrote the order for it. This was a battery count against the physicians, not against the nurses. There's no allegations against the nurses here. And yet, if the doctor writes an order and the patient agrees to accept it the first time and it's taken, and then doesn't take it the second time, but the nurse gives it anyway, that's not on the doctor. And that's what the plaintiff was arguing, that this case was against the doctors for their prescribing of it. And they did. They did, but that wasn't the battery. Well, upon Dr. Maurice's return to work after days off, Yes. did she not confer with two or three of her colleagues, at which time they more than doubled the dosage? The dosage had been doubled 24 hours before. Was there any indication that the decedent had withdrawn his refusal? Well, you're saying because he lied there and received the dosage. Well, I'm saying because he was an alert and oriented man who was in acute distress at 430 in the morning on the 22nd when they decided to change the dosage of this medication, that he accepted it. So he would know that what was being administered was exactly what he told him he didn't want. He would know that. I would think so, yes, absolutely. So the doctor wrote the order at 430 in the morning, but it actually wasn't administered until 10 o'clock that morning. Right. Doubled the original, more than doubled the original dose. Right. That is a therapeutic dose. That is an appropriate therapeutic dose. And the doctor had no question about it. Are you claiming that this was an emergency situation at that point? Well, it was in response to an emergency situation, yes. Where is the emergency situation listed on the chart? Well, it's written. Actually, the order is written stat. So at 430, stat means right away. Yes. And it didn't get administered until 10. True. But there's no criticism of that either. So what kind of emergency is that? Well, the doctor wrote the order stat. She was not part of the administering of it. So she writes the order for the nurse to give it. And she does it in response to the acute situation that's going on at 430 in the morning. And Dr. Marty agrees that that was appropriate because of his condition at that time. So that order was appropriate. Now, there is no evidence, and it's the plaintiff's burden to show that there's evidence that he refused that dose. Because there is evidence later that he refused doses, and it was not given. There's no evidence that he refused this dose. Did the doctor inform the patient at 430 in the morning or even at 10 o'clock in the morning when the dose was given that, oh, your situation has changed, and now we want to change to this therapeutic larger dose of Lovenox? Is that okay with you? As I said, Dr. Wendt could not recall the specifics of the conversation she had with him at 430 in the morning. I doubt she was there at 10 o'clock in the morning when it was being given. Well, doesn't the form say the physician is responsible for fully informing the patient or the consenting party? Yes, but that consent doesn't apply to medications. It applies to invasive procedures. There's no testimony from anybody that it applies to medications. In fact, all of the evidence, all of the testimony is the complete opposite. It does not apply. Is Lovenox, besides being a medication, also a treatment for a specific kind of circumstance? All medications are, as is Lovenox. So if somebody walks into the hospital and really all they need is an aspirin and a painkiller, they don't have to sign a consent form. Right. And they don't sign a consent form. Right. It's a rush. Absolutely. Not their policy. Right. Isn't there a significant difference between an aspirin and the injection of Lovenox? Well, I use that just to show the distinction. Actually, my recollection is the consent policy talks about the routine procedures, such as prescribing aspirin or drawing blood or chest X-ray. Well, it doesn't talk about prescribing aspirin, but it does talk about those other things. But the thing is he was on a lot of complicated medications. He was non-aspirin. He was on a lot of complicated medications. There's no written consent for any of those. I think that shows what the procedure and the custom and practice is. You don't get written consent when you're giving medications. The patient's presence in the hospital is a consent to treatment unless he refuses. And as you saw through the record, there are many things that he did refuse. And the patient can direct their own medical care, and they often do. And he certainly can refuse to have these treatments. And when he did refuse, it wasn't done. Ms. Bush, here is a patient who is in such a state that the attending physicians deemed him too weak to subject him to a CT scan, where he'd be rolled on a gurney. Well, you know the CT procedure. I don't know that that's physically demanding. But since medical staff has determined that he's too weak to undergo that procedure, this person cannot rely on his prior refusal? No. First of all, it wasn't that he was too weak for the CT scan. My understanding is that it was his oxygen needs. They were concerned about his oxygen needs. He actually had a CT scan done later after he was intubated. It was while you're on that kind of oxygen and you have that kind of respiratory demand, when you're not intubated, that things can crash in the elevator. And that's what they were talking about. There's no indication that he was- And a person in that condition should be expected to say, I don't want what you're about to administer, and not be able to rely on his refusal that he's already registered and has been charted. Yeah. Again, we don't know what the interchange was between the nurse and the doctor and patient. Right. That's mere speculation. But we do know what he said. Right. I don't need that. And we know that the nurse interpreted that as a refusal. At that time, yeah. My question to you is, given the subsequent chain of events, is it your position that he should have reiterated his refusal? He did reiterate his refusal at various times. So, yes, if he- Once. No, a couple of different times. On the 23rd. For the Lovenox. For the Lovenox. He got three doses for the Lovenox. There were many things that he did not accept at various times. So he knew how to make a refusal. So, yes, my position would be that he would refuse, and he did refuse when he didn't want something done. Okay. You pointed out that this was a question concerning the medical battery. The essence of medical battery is a lack of consent. It's the unwarranted touching, yes. The unauthorized touching. I have one more question. Sure. The Lovenox. Where were the CRCL calculations documented? The CRCL calculations are not documented. And according to the physicians, they are not typically documented. This is something the physicians figure out on their calculator, and they know what those are. The bottom line is this. Dr. Schleiman testified that at no time when he was taking Lovenox, did his CRCL fall below 30. But we have no documentation of that. No, but you can calculate it. And they did calculate it in the courtroom. Not on the charts. Not on the charts, because they knew what they were doing. It's like, you know, when you're – you don't chart it for the future in case there's a malpractice action. You chart it so you know what doses you're ordering at the time and what's going on with the patient. So they calculate it, but they don't write it down every time. Don't you also chart it and pass it on to your colleagues as well, so that when you take two days off, the course of treatment will continue? Well, yeah. It certainly wasn't an issue on the 21st. Just as an example. But they can figure it out themselves. And they do figure it out themselves. When they take over the care of the patient, they come in, they've got the numbers, they can look at it themselves. You don't have to tell a patient, somebody else, what your calculation was. So they would know that my calculation of his creatine was 27. They'd know that. They could figure it out themselves. In all that time, it may change. Right. And it does change. But it never changed in this case while he was on the Lovenox.  How do we know that? Because they calculated it at trial. Yeah. But how would the next doctor, after the doctor that calculated it, know whether there's been any change or not? Because they would look at the creatine that was on the record, because they were doing repeat CBCs and creatines, which is a part of the blood work, and the BUNs, and they were getting those results. So they could calculate it at any time. And they also said that they did calculate it. And at no time did it fall below the level where the dosing card recommended that it could be given. Your name, please, sir? Robert Austin. I was one of the trial lawyers who gave this test for kidney function. It was done in the evening and the next morning. So if you do this calculation in the evening, you're using one set of figures to find out whether it's over 30. Next morning you get new results. You have to recalculate it. So it's, you know, knowing they have to calculate it the next morning. And the evidence is it was never below. The testimony is it was never below, but there is no documented evidence that it was never below, because it's not in the charts. But they calculated it at trial under questioning by Mr. McWilliams. Dr. Schleiven calculated it each time for him. And they came up with the results, and I believe he died. He chugged it on a pad so the jury knew exactly what was going on and what was trending. So I think that there's no doubt that the testimony showed that it never fell below the recommended dosing card, the recommended level on the dosing card. Any other questions? I just want to be crystal clear. Your position is that the receipt of medications by a patient after his expressed refusal implies that he's rescinded that refusal. Yes. But isn't it just as reasonable to infer that his refusal was being dishonored? Not when you see, if you look at it in this case, especially when you know that he did refuse it again later. So it's not like he was, you know, all of a sudden just getting low enough and just acquiesced to it. He did refuse it later, and when he refused it, he didn't get it. So just even looking at it in this context of this case, it is clear that he did not get the low enough when he refused it. And I think that the implication is certainly there, based on all the other medications he was on and all the other times he had refused and not taken it, that when he did take medication, he was accepting it, and when he refused it, he did not get it. And that I have to apply or infer as well that every time he took medication, he knew precisely what that medication was. In this case, I think it's actually accurate in this man. Absolutely. A civil engineer who had been under the... Because he had been advised, as the consent policy suggests, he had been advised of what was being administered and the risk. I think it appears to me that he knew what was going on. When he said, I don't need blood thinners, he knew what they were. He'd been under medical care for a couple of years with this dire condition that he had, and I think that he was sophisticated enough to know that. That's just my implication from the records. Obviously, I don't know for sure what his thoughts were. But it appears to me, and I certainly can appreciate the fact that a nurse on one day documents, what if it's five days later? Does the nurse even know that this prior refusal had occurred if the patient accepts the medication at that time? So you believe that we should believe that every nurse that came in with a bunch of medicine said, sir, here's this medicine, here's this medicine, here's this medicine. I have these 17 pills. The orange one is this. The blue one is this. And I have these two shots. I think that they do, yes. Was there any testimony to that? This is not a nurse... No, there were no allegations against the nurse. So you don't know for sure that he did know what he was getting. But that goes to the nurses. And that's another point in this, I think. With regard to the prescription, it's not like they were ordering a DES, as in the Mink case, with these women who had completely no knowledge of what was happening. They relied on the nurses to give the medication to the patient. If the nurses gave the medication to the patient against his will, that's on the nurse. That is not on these doctors, these doctors' defendants. They prescribed the medication that was good for him. There's no criticism of that. And if he refused it and the nurse gave it anyway, that's on the nurse. And there's absolutely no testimony or criticism of the nurses here. Let's assume that we've accepted that argument. Would the hospital have any responsibility or culpability? If there were allegations in that regard, and there were none. None. There's no testimony whatsoever from any nurse or against the hospital that this is what occurred. It's all against the doctors. And Mr. McClellan made that clear to the judge when he amended his complaint. Because one of the issues was, well, wait a second, prescribing isn't touching. So how can this be a battery? And that discussion occurred. The Mink case was discussed. And it was determined that if the doctors write a prescription and that prescription is given against the patient's will because they have absolutely no consent at all to the medication, as they did in the DES case, which I think is very distinguishable from the situation here, then that might be a problem. But that's not what happened here. He took it on certain occasions. He didn't take it on others. Okay. And you are saying that when Dr. Wendt, on the morning of June 22nd, more than doubled the dose of Lovenox from 30 to 70 twice a day, and then on June 23rd, when Drs. Morey, Schleierlin, and Silva concurred with that, 70 milligrams twice a day, that they didn't need the patient's consent to do that? To acquiesce in the order? I'm not sure I understand. Did they have an obligation to explain to him, we're going to have to change the dose here, you've got a different situation, you've gone into some new situation? Again, I think that that would have occurred at the time that Dr. Wendt was seeing him. Whether it did or not, she could not recall. Well, what about Dr. Morey, Dr. Schleierlin, and Dr. Silva at 9 o'clock on the 23rd? Did they go in and say to him, look, your situation is worse, and here's what we think we need to do? They were never asked. They were never asked. Do you agree that a medical battery could be caused by a doctor ordering something to be done by a nurse who then follows that order? In certain circumstances, absolutely. For example, if a doctor said that they wanted to sterilize a patient without the patient's consent, absolutely, it could happen. Here you have Lovenox being given without the patient's consent. I disagree. I think that the Lovenox was given with the patient's consent. It was not given when he refused it. But the argument remains. If the nurse can do something at the direction of the doctor, would the doctor then be considered the toucher, if you will? No, not in a situation like this. If the doctor directs a nurse to do something, and that results in contact, can that then be imputed to the doctor? In certain circumstances. But I don't think in a situation like this where the patient sometimes accepted it and sometimes refused it. Then it's a call by the nurse at the time. There is no blanket assertion. Let's assume the argument, though, he always refused it, and the doctor prescribed it anyway, and the nurse administered it, the doctor can still be liable for medical battery, right? I don't think in a situation like this they could. Because if the nurse gave it anyway and didn't advise the doctor about it, If it happens at the doctor's direction. Right. If it happens at the doctor's direction. Right. But the nurse has an independent responsibility to that patient. The nurse cannot blindly follow a doctor's direction. They have an independent standard of care, an independent responsibility to the patient. I'm not saying they can't be also culpable. No, I understand. It doesn't exculpate the doctor, does it? I think it does in certain circumstances. It would not in a situation that I talked about with regard to the DES situation, for example. So, a nurse can't administer medication that's not authorized by a doctor. No, absolutely. Absolutely. Okay. Thank you, Counselor. It's been very helpful. We're going to give Mr. McClellan two or three minutes. Can I just, I wanted to go on to partner talk. We're going to do a closing. Oh. I promise. Okay. We're going to ask Mr. McClellan to take two or three minutes in rebuttal, and we'll give you two minutes to close and him two minutes to close, and then that'll be the end of it. Thank you. Thank you. Okay. Thank you. One of the points I think that your honors have picked up on is that he made a refusal. It was documented in the chart. There is testimony by Dr. Maurice that when she did the handoff to Dr. Wendt, she never told her about that. There is testimony by Wendt, she never read the chart to see that it had been documented in there he had refused the course of treatment. That's part of the evidence in that. And when they ask about Dr. Silva, I ask her when she returned the next morning, she again agreed with the continuation of the law of an ox, now at a higher dose, otherwise I would have stopped the medication or treatment, and we make a citation to the place for that in there. He refused the treatment. When she talks about that the treatment was stopped three days later, he was in a coma with irreversible brain damage. He did not refuse it again and why it was stopped. The reason what happened was they finally bothered to pay attention to the CT scan two days later and said the guy doesn't have a pulmonary embolus, we need to decrease it, and that's what they did. That's the CT I'm talking about. And this thing about, for the first time at trial, they'd never said it before. In fact, one of the things I put in the brief was they had taken the position that the decrease in low an ox three days later was according to the standard of care. I asked Dr. Silva, and it was in her deposition, and what was that based on? The CT scan done on the 21st. They waited three days to react to it. This man had an autopsy done. He had no pulmonary embolus. He had no DVTs, no nothing. They were basically wandering in the woods for three days after this man had refused the care. I think Mink, and the thing is it's not just the Mink case, which you go on into Gaskin, is, and Prosser, I think, put it best, there's no hostile intent. You only need to show an intent to bring about the contact. And Mink made it very clear. A doctor ordering a nurse to give an oral medication is battery on the part of the doctor. No question about it. And they try and walk away from their consent procedure, and I think your Honor brought this up very well. This isn't an informed consent case. It's a consent case. And the very top part of their consent says the consent of the patient should be obtained prior to treatment. In fact, they have down here where you have to have a verbal consent that still needs to be recorded in the chart for routine diagnostic procedures, including physical exam, the taking of blood, X-rays, and laboratory tests. They don't give them a pass on medication. Then you go to the next page, individual procedures regarding consent, any treatment or procedure which poses a significant risk to the patient. Every doctor in this case admitted that Robinox has a serious, significant risk of causing brain bleeds. You go down to the next part. It says here, such consent is valid until revoked by the patient. He did. He revoked. It was put in the chart. Once that happens, it starts over again, and they've got to go through, and you all brought it up on this. You've got to tell them what's going on. Why would you in the hospital, if you're getting a number of medications, and you said, I don't want this, it's been stopped, why would you ever think that they're giving you something you've refused? And this thing about, oh, well, every time he got it, he had to have consented. The last two times he got it, he was in a coma, so he couldn't have consented. This is something they sort of made up after the fact that, oh, yeah, if you get it, you must have consented. And the thing about the other medications, there was a motion in limiting it was kept out. There was no evidence about the other medications or anything of that nature. They're trying to spin that in here now. Thank you. I just wanted to reiterate with regard to the consent that nobody established that the consent form was the standard of care, and he had no testimony presented in that. Simply providing a policy or submitting hospital bylaws or rules and regulations is not sufficient to establish that the consent form was the standard of care or that it was applicable in this particular situation. But I do want to move on to one other thing, and that is proximate cause. Mr. Sekharov had advanced chronic leukocytic leukemia with mastocytosis. He had pneumonia. He had pus in his lungs, and he died of respiratory arrest, which caused a stroke, hypoxic event, and then he bled into the stroke. That is the cause of death. By the time that event occurred, the Lovenox was out of his system. Everybody agreed about the half-life of the Lovenox. The Lovenox is a red herring in actuality in this case. As Dr. Silver testified as well, Lovenox is not the type of medication as a low molecular weight heparin versus a heparin that causes spontaneous brain bleeds. It may cause bleeding to worsen if there is an infarct or if there is a trauma, but it does not cause spontaneous bleeds, at least in her estimation. The bottom line is the jury could easily have found that this man's death was caused by the pneumonia, his hypoxia, and his metastasis of the leukemia into his brain versus anything to do with the Lovenox. And I think that there is a no showing that this verdict should be overturned. I think it is essential to point out that simply putting a policy into place, as the plaintiff has done here, is not sufficient to establish a prima facie case for negligence or for battery. I would also submit again that the proximal cause of this man's death was his underlying medical condition, which was deteriorating and had deteriorated significantly since his prior discharge, which is why when he came into the hospital his oxygen needs were so advanced, given the fact that his O2 saturation was at 80%. There was testimony from one of the physicians, and I'm sorry I can't remember which one it was, who I believe might have been Neuberger, but I can't recall, who said that once a patient with CLL ends up on a respirator, which he did prior to this whole event with the brain bleed, etc., it is very unlikely that they will ever be taken off of that respirator, and it's very likely that their chances of survival are slim at that point. Thank you. You said you're closing? It is. Thank you. Mr. McClellan, you've got a minute to close up. What are you asking us to do? I'm asking for a new trial on this matter on the battery counts, and as to Dr. Maurice, and on the other counts. I believe that all of a sudden they throw out, oh, he was going to die anyway. The man had been in the hospital three weeks before, he wasn't going to die, had been to see one of these other doctors two weeks before that who said, I'll see you in another 60 days. So all this question about he was so sick, in fact, I would refer you to our reply brief where we went through and laid out the true facts on that. I also put in there about striking their statement of the case because it didn't conform to the rule, nor did their statement of facts, and I would ask you to do that. Medical battery, a doctor commits medical battery by ordering the administration of an oral medication by another. That's what happened in this case. It's a very straightforward case. It's a question of fact. Forget the policy. I don't even need the policy. I've got the chart where it says the patient refuses this treatment. That's a question of fact for the jury as to whether or not a medical battery has occurred. What I'm saying is the judge took this away from the jury. The jury should decide, and I think Prosser said it very well, you've got to look at the circumstances, the timing, and everything else like that. Everything I've heard counsel argue are all questions of fact. That's why I'm saying it should have gone to the jury on the battery count. Once Dr. Maurice was taken out of the case, the doctor that wrote 600 orders for this man started and continued and everything else. It was essentially a clear message to the jury, nobody's liable. So we're asking for a new trial on the battery count as to Maurice and as to all the doctors. And I would love to go on, but I understand oral argument is not a right, it's a privilege. Thank you very much for hearing this very important case by clients, and I really appreciate it. Thank you all. Counsel has been very helpful, and we'll take it under advisement.